No. 23-15259

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

BURNS PAIUTE TRIBE,
Intervenor-Plaintiff/Appellant,

v.

ESTER M. MCCULLOUGH, BUREAU OF LAND MANAGEMENT, U.S.
DEPARTMENT OF THE INTERIOR, and LITHIUM NEVADA
CORPORATION,
Defendants/Appellees.

_____

On Appeal from the United States District Court for Nevada, Reno in Case No.
3:21-cv-00080-MMD-CLB, Chief District Judge Miranda M. Du

_____

## APPELLANT'S OPENING BRIEF

_____

March 22, 2023

Rick Eichstaedt
Rey-Bear McLaughlin, LLP
421 W Riverside Ave., Suite 1004
Spokane, WA 99201-0410
509.251.1424
rick@rbmindianlaw.com

*Attorney for Burns Paiute Tribe*

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...................................................................2

ISSUES PRESENTED FOR REVIEW ..............................................................2

STATEMENT OF THE CASE ............................................................................3

    A.    NATURE OF THE CASE

    B.    STATEMENT OF THE FACTS ................................................................ 4

        1.    The Project. ................................................................... 4

        2.    The Tribe and the Significance of Thacker Pass. ..................... 5

        3.    Consultation with the Tribe. ....................................................... 7

SUMMARY OF THE ARGUMENT .....................................................................8

STANDARD OF REVIEW ..................................................................................9

ARGUMENT ......................................................................................................11

    I.    THE BLM FAILED TO CONSULT WITH THE BURNS PAIUTE TRIBE PRIOR
        TO THE ISSUANCE OF THE ROD AND EIS............................................ 11

        A.    The NHPA obligates the BLM to consult with Tribes that attach
            religious and cultural significance to a property. ................... 11

        B.    BLM's own Agency Tribal Consultation Policies direct
            consultation with Tribes, such as the Burns Paiute Tribe. ....... 13

        C.    NEPA creates an independent obligation, separate from the
            NHPA, for the BLM to consult with Tribes. ........................... 18

        D.    BLM had a duty to consult with the Tribe and failed to do so. 18

1. BLM's after-the-fact email does not demonstrate that the agency made a reasonable and good faith effort to identify Tribes for consultation. .................................... 20

2. A 17-year-old statement by a Burns Paiute employee on a different project does not excuse BLM's failure to consult with the Burns Paiute Tribe. ........................... 24

3. No evidence exists in the record that BLM sought assistance from the Nevada SHPO to determine Tribes with which to consult. .................................................. 26

4. Publication in the Federal Register does not satisfy BLM's consultation obligations. .................................... 28

5. BLM has an obligation to consult with every Tribe with an interest in the area on every project. ......................... 30

II. THE BLM FAILED TO DISCLOSE AND ANALYZE CURRENT CULTURAL USES AND THE SIGNIFICANCE OF THE AREA TO THE TRIBE IN THE ROD AND EIS. ............................................................................. 31

A. NEPA obligates the BLM to take a "hard look" at the impacts of a project, including impacts to cultural resources. .............. 31

B. The EIS and ROD failed to disclose and analyze current cultural uses and the significance of the Project area to Tribes. .............................................................. 33

C. BLM's failure to consult with the Tribe deprived it of necessary information to take a "hard look" at impacts of the Project. ... 37

D. The District Court erroneously found that the Tribe lacked prudential standing to raise NEPA arguments. ........................ 38

CONCLUSION ................................................... 40

CERTIFICATE OF COMPLIANCE ................................... 41

STATEMENT OF RELATED CASES ...................................................................42

CERTIFICATE OF SERVICE...................................................................................43

# TABLE OF AUTHORITIES

<u>Cases</u>

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,*
  397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) ................................... 39

*Clarke v. Sec. Indus. Ass'n,*
  479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) ................................ 39

*Comanche Nation v. United States,*
  No. CIV-08-849-D, 2008 WL 4426621, at 19 (W.D. Okla. Sept. 23, 2008)...... 13

*Confederated Tribes & Bands of Yakima Indian Nation v. FERC,*
  746 F.2d 466, 475 (9th Cir. 1984)......................................................................... 29

*Ctr. for Biological Diversity v. United States Army Corps of Engineers,*
  Case No. CV 14-1667 PSG (CWX), 2015 WL 12659937 at *21
  (C.D. Cal. June 30, 2015)........................................................................ 26, 27, 36

*Ecology Ctr., Inc. v. Austin,*
  430 F.3d 1057, 1062 (9th Cir.2005).................................................................... 10

*Lower Brule Sioux Tribe v. Deer,*
  911 F.Supp. 395, 399 (D.S.D.1995).................................................................... 17

*Marsh v. Oregon Nat. Res. Council,*
  490 U.S. 360, 378, 109 S. Ct. 1851, 1861, 104 L. Ed. 2d 377 (1989)............... 10

*Massachusetts Fair Share v. Law Enf't Assistance Admin.,*
  758 F.2d 708, 711 (D.C. Cir. 1985) .................................................................... 17

*Morongo Band of Mission Indians v. FAA,*
  161 F.3d 569, 581 (9th Cir.1998)........................................................................ 11

*Morton v. Ruiz,*
  415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) ................................ 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29, 43 (1983) ................................................................................. 10, 32

*Muckleshoot Indian Tribe v. U.S. Forest Serv.,*
 177 F.3d 800, 805 (9th Cir. 1999).................................................................... 11

*Nat'l Ctr. for Preservation Law v. Landrieu,*
 496 F.Supp. 716, 742 (D.S.C.) aff'd. per curiam,
 635 F.2d 324 (4th Cir.1980)........................................................................... 12

*Nat'l Small Shipments Traffic Conference, Inc. v. ICC,*
 725 F.2d 1442, 1449 (D.C. Cir. 1984) ............................................................ 17

*Navajo Nation v. U.S. Forest Serv.,*
 479 F.3d 1024, 1029 (9th Cir. 2007)............................................................... 34

*Neighbors of Cuddy Mountain v. United States Forest Service,*
 137 F.3d 1372, 1376 (9th Cir. 1998)............................................................... 25

*Oglala Sioux Tribe of Indians v. Andrus,*
 603 F.2d 707, 713 (8th Cir.1979).................................................................... 17

*Ohio Forestry Association v. Sierra Club,*
 523 U.S. 726, 733-34 (1998)........................................................................... 24

*Pit River Tribe v. U.S. Forest Serv.,*
 469 F.3d 768, 778 (9th Cir. 2006)................................................................ 9, 10

*Presidio Golf Club v. National Park Service,*
 155 F.3d 1153, 1158–59 (9th Cir.1998)........................................................... 39

*Pueblo of Sandia v. U.S.,*
 50 F.3d 856, 860 (10th Cir. 1995).................................................................... 29

*Quechan Tribe v. U.S.,*
 755 F. Supp. 2d 1104, 1118-19 (S.D. Cal. 2010).............................................. 29

*San Luis & Delta-Mendota Water Auth. v. Locke,*
 776 F.3d 971, 994 (9th Cir. 2014).................................................................... 10

*Shiny Rock Min. Corp. v. United States,*
 906 F.2d 1362, 1364 (9th Cir. 1990)............................................................... 28

*Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs,*
 255 F. Supp. 3d 101, 123 (D.C. Cir. 2017).............................................. 37, 38

*Turtle Island Restoration Network v. U.S. Dep't. of Commerce,*
  878 F.3d 725, 732- 33 (9th Cir. 2017) ............... 10

*United Keetoowah Band of Cherokee Indians
in Oklahoma v. Fed. Commc'ns Comm'n,*
  933 F.3d 728, 748 (D.C. Cir. 2019) ................ 25

*United States v. Caceres,*
  440 U.S. 741, 760 (1979) ............... 17

*Western Watersheds Project v. Kraayenbrink,*
  632 F.3d 472, 486 (9th Cir.2011) ............... 39

*Wetlands Action Network v. U.S. Army Corps of Eng'rs.,*
  222 F.3d 1105, 1114 (9th Cir. 2000) ............... 33

*Winnebago Tribe of Nebraska v. Babbitt,*
  915 F.Supp. 157, 163 (D.S.D.1996) ............... 18


## Statutes

28 U.S.C. § 1291 ............... 2

28 U.S.C. § 1331 ............... 2

28 U.S.C. § 1361 ............... 2

28 U.S.C. §§ 2201-2202 ............... 2

42 U.S.C. § 4331(b)(4) ............... 33, 40

42 U.S.C. § 4332 ............... 32

42 U.S.C. § 4332(2)(C) ............... 32

42 U.S.C. § 4332(c) ............... 18

42 U.S.C. §§ 4321 ............... 1

5 U.S.C. § 702 ............... 39

vi

5 U.S.C. §§ 701-706 ................................................................. 2

5 U.S.C. §§ 706(2)(A), (2)(D) .............................................. 10

54 U.S.C. § 302706(b)(1) ....................................................... 12

54 U.S.C. § 304108(a) ............................................................. 13

54 U.S.C. § 306108 ................................................................. 11

54 U.S.C. §§ 300101 ............................................................... 1

Regulations

36 C.F.R. § 800.16(f) ............................................................. 12

36 C.F.R. § 800.2(a) ............................................................... 29

36 C.F.R. § 800.2(c)(2)(ii) ......................................... 12, 21, 27

36 C.F.R. § 800.2(c)(2)(ii)(A) ........................................ 13, 30

36 C.F.R. § 800.2(c)(2)(ii)(B), (C) .................................... 12

36 C.F.R. § 800.2(d)(2) .......................................................... 29

36 C.F.R. § 800.2(ii)(A) ......................................................... 12

36 C.F.R. § 800.4(a)(3) ........................................................... 13

36 C.F.R. § 800.5(a) .......................................................... 13, 14

40 C.F.R. § 1500.1(a) ............................................................. 32

40 C.F.R. § 1501.2(b)(4)(ii) .................................................. 18

40 C.F.R. § 1501.9(b) ............................................................. 18

40 C.F.R. § 1502.1 .................................................................. 32

40 C.F.R. § 1502.16(a)(8) ................................................. 33, 36

40 C.F.R. § 1503.1(a)(2)(iii) ................................................................. 18

40 C.F.R. § 1508.27 ................................................................................ 38

40 CFR § 1508.14 ................................................................................... 33


Federal Register Notice

65 Fed. Reg. 67,249, 67,250 (2000) ...................................................... 14

65 Fed. Reg. 77697, 77702 (December 12, 2000) ................................. 13

65 Fed. Reg. at 77702 ............................................................................. 22

78 Fed. Reg. at 59959 ........................................................................ 23, 24

86 Fed. Reg. 7491 (2022) ....................................................................... 14

Other Authorities

Aila Hoss, <u>Securing Tribal Consultation to Support Tribal Health Sovereignty</u>, 14
     Ne. U.L. Rev. 155, 178 (2022) ........................................................ 31

BLM Manual 1780 (Tribal Relations) .......................................... 18, 19, 36

Colette Routel & Jeffrey Holth, <u>Toward Genuine Tribal Consultation in the 21st
     Century</u>, 46 U. Mich. J.L. Reform 417, 463 (2013) ........................... 31

Interior Departmental Manual ................................................................. 18

The Interior Secretarial Order No. 3317 (December 1, 2011) ............... 17

**INTRODUCTION**

The Burns Paiute Tribe ("the Tribe") challenges the Bureau of Land Management's failure to comply with the requirements of the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 300101 *et seq.,* the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.,* and applicable agency policies in its approval of the Thacker Pass Lithium Mine Project ("Project") in northern Nevada. The proposed mine will consist of a 1,100-acre open pit mine, a 1,166-acre clay tailings facility, 300 acres of mineral exploration disturbance, two waste rock storage facilities, material stockpiles, a sulfuric acid plant, processing facilities, a water well and 7-mile pipeline, a 7-mile electrical transmission line, haul roads and secondary roads, and various ancillary facilities. The Tribe utilized the mine area since time immemorial and it remains of cultural, historic, and religious significance to the Tribe.

The Tribe asserts that the Bureau of Land Management ("BLM") unreasonably failed consult with the Tribe prior to the Project's approval and that the BLM unreasonably failed to consider and analyze the cultural significance of the area to the Tribe and other Tribes required by the NHPA, NEPA, and agency policies.

1

## JURISDICTIONAL STATEMENT

The Tribe filed this timely appeal from the February 6, 2023, order denying its motion for summary judgment and granting the Federal Defendants and Lithium Nevada motions for summary judgment. 1-ER-2-50.

The Tribe alleged District Court jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (action to compel an officer of the United States to perform her/his duty), and 28 U.S.C. §§ 2201-2202 ("creation of remedy" and "further relief" provisions establishing power to issue declaratory judgments in case of actual controversy). 2-ER-53.

The Tribe had a right to bring this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. The Ninth Circuit by 28 U.S.C. § 1291 has jurisdiction over appeals from final decisions of the U.S. District Court of Nevada wherein an injunction has been refused by the District Court.

## ISSUES PRESENTED FOR REVIEW

1.    Did BLM violate the requirements of the NHPA, NEPA, and its own applicable policies when it failed to consult with the Burns Paiute Tribe prior to approving the Thacker Pass Lithium Mine?

2.    Did BLM violated the requirement of NEPA by failing to take a "hard look" at impacts to cultural resources, including current tribal use and the significance of the impacted area to Tribes?

2

## STATEMENT OF THE CASE

A.     NATURE OF THE CASE

The Tribe appeals the District Court order denying summary judgment and allowing the construction of the Thacker Pass Lithium Mining Project, which would irreversibly impact an area utilized by the Tribe since time immemorial having cultural, historic, and religious significance to the Tribe.

In the February 6, 2023 order, the District Court denied the Tribe's motion for summary judgment and granted the Federal Defendants and Lithium Nevada motions for summary judgment because, according to the court, "BLM's decision not to consult with Tribal Plaintiffs before issuing the ROD was reasonable and made in good faith." 1-ER-44.  In reaching this decision, the court relied, in part, on one 17-year-old statement from a Tribal staff member (not Tribal Council member) on a different project, the ethnographic assessment for a resource management plan ("RMP") (not the Thacker Pass EIS or NHPA consultation), that it "would defer consultation to the tribes that had reservations closer to the study area." 1-ER-40, *citing*, 4-ER-520.  The court also found that publication of the available of a Draft Environmental Impact Statement ("DEIS") in the Federal Register should have provided the Tribe sufficient notice and satisfied BLM's consultation responsibilities.  1-ER-41.

3

The District Court also found that BLM's Environmental Impact Statement ("EIS") sufficiently addressed the current use and cultural, historic, and religious significance of the area because the record contains archaeological surveys and an ethnographic narrative that ended in 1936 with the creation of the Fort McDermitt Reservation. 1-ER-45-46. The court also determined, in a footnote, that the Tribe lacked prudential standing to raise arguments regarding the sufficiency of the EIS. 1-ER-45.

The Tribe timely appealed that order.

**B.    STATEMENT OF THE FACTS**

**1.    The Project.**

The Thacker Pass Lithium Mine Project ("Project") consists of construction and operation of an open pit mine, lithium processing plant and ancillary facilities, and continued exploration activities on BLM's Winnemucca District in northern Humboldt County, Nevada. 2-ER-117-118. It would affect 17,933 acres and directly disturb 5,695 acres of public land on the largest known lithium reserve in the United States. 2-ER-89.

On December 3, 2020, the BLM completed and released its EIS for the Project and on January 15, 2021 issued a Record of Decision ("ROD") approving the Project. 2-ER-85. These documents and the decisions made therein are the subject of this appeal.

4

**2.** **The Tribe and the Significance of Thacker Pass.**

Since time immemorial, the Burns Paiute Tribe has occupied and utilized on approximately 5,250 square miles of land in central-southeastern Oregon, northern Nevada, northwestern California, and western Idaho, including the Thacker Pass area that is subject to this litigation. 2-ER-54, 70. The scope of the Tribe's traditional territory below:

**Traditional Territory (Burns Paiute Tribe)**

The Burns Paiute Tribe traditional aboriginal territory extends from the east foothills of the Cascades up north to The Dalles, extending east into Boise, Idaho, south to Smokey Spring, Nevada, and into California, to the southern tip of Goose Lake.



Scale: 1:3,000,000

*Id.*; *see also* 3-ER-442.

5

As tribal members travelled throughout their traditional territory, they buried their dead, and left evidence of their use and occupation of the land, including the areas impacted by this litigation. 2-ER-71. Tribal members. hunted, fished, and gathered edible plants, harvesting their diet from lakes, marshes, streams, and uplands throughout their territory. *Id*.

Evidence of past tribal use is contained in the record. In the EIS, BLM identified 1,020 cultural resource sites, fifty-six historic properties eligible for inclusion on the National Register of Historic Places, and a part of a large cultural district: the Thacker Pass component of the Double H/Whitehorse Obsidian Procurement District that would all be adversely affected by the Project. 2-ER-125. The vast majority of the cultural resource sites contain artifacts created by Tribal ancestors. *Id*.

However, the significance to the Tribe and other Tribes is not simply its historic and archaeological relics. Many of the Tribe's traditional cultural practices endured and are still practiced among living tribal members. 2-ER-72. Tribal members continue to hunt, gather food, and do beadwork and drum-making in traditional ways and continues to have strong ties to the landscape throughout its traditional territory, including Thacker Pass. *Id*. This area contains plants and wildlife that the tribal members hunted and gathered and continue to hunt and gather, including chokecherries and mule deer. *Id*.

The Tribe and their members attach significant religious and cultural value to Thacker Pass. 2-ER-72. It is considered a spiritually powerful place that contains the remains of tribal ancestors and, according to tribal beliefs, their spirits. *Id*. It is also the habitat to golden eagles, which tribal members believe have a spiritual connection for the Tribe. *Id*. The area was also an important place for the gathering of obsidian used to make arrowheads and other tools. *Id*.

Paiute oral history holds that Thacker Pass was the site of a massacre. Thacker Pass is known as "Peehee mu'huh" in the Paiute language, which means "rotten moon." 2-ER-72.

The Tribe believes that the actions associated with the Project threatens areas of significant historic and cultural significance to the Tribe in Thacker Pass. 2-ER-73. The Project would destroy lands used, since time immemorial, by members of the Burns Paiute Tribe.

### 3.     Consultation with the Tribe.

Consultation with federal agencies is a critical component of the Tribe's efforts to protect its heritage and culture. Even though the Project lies in the Tribe's traditional territory, 2-ER-70, 3-ER-442, the Tribe was never notified of it by BLM and did not learn about it until June 2021. 2-ER-73. The Tribe has never received information from the BLM, the mining company, or anyone else to provide information about the Project or engage in government-to-government consultation

7

on impacts to cultural resource sites or proposed mitigation measures to address impacts to cultural resources, including the development of a cultural resource memorandum of agreement ("MOA"), prior to the finalization of the EIS and ROD. *Id*.

BLM only notified the Fort McDermitt Paiute and Shoshone Tribe, Summit Lake Paiute Tribe, and the Winnemucca Indian Colony about the Project. 2-ER-129. No efforts were made to provide the Burns Paiute Tribe with an opportunity to consult on the MOA or on the development of the EIS. 2-ER-73.

Once the Tribe learned about the Project, the Tribal Council sent a letter on June 16, 2021, to the Winnemucca District Office of the BLM. 2-ER-73, 76-78. In this letter, the Tribe requested that "any plan for mechanical trenching operations and other construction activities" associated with the Project be halted "until meaningful government-to-government consultation with [the Tribe] and all of the tribes that are connected to Thacker Pass has concluded." 2-ER-76. No response was provided to the Tribe to this letter prior to the onset of litigation. 2-ER-74.

## SUMMARY OF THE ARGUMENT

First, the BLM violated the consultation requirement of the NHPA, NEPA, and the agency's own consultation policies by failing to consult with the Burns Paiute Tribe. The BLM was arbitrary and capricious in relying upon a post-consultation BLM staff email, which failed to mention the Burns Paiute Tribe, and

identified factors considered in deciding about tribal consultation that are either not legally or factually supported by the record, including geographic proximity, historical ties, and previous interest. The BLM also was arbitrary and capricious in relying on a 17-year-old statement from the tribal staff member that the Tribe on another BLM project. The record indicates that the BLM was aware that the area was ancestral territory of the Tribe and that the BLM had invited the Tribe to consult on other projects in the same District. The record does not support that the BLM took reasonable and good faith efforts to identify Tribes with which to consult.

Second, the BLM violated the requirements of NEPA by failing to take a "hard look" at the current use of the Project area by tribal members and the significance of the area to the Tribe. The record indicates that the EIS and supporting documents only inventories archaeological resources or historic use of the area by Tribes ending in 1936. NEPA requires the agency to take a "hard look" at the current use and significance of the area to the Tribe.

## STANDARD OF REVIEW

This Court reviews a district court's summary judgment de novo, applying the same standards that applied in the district court. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006). The Administrative Procedure Act ("APA") provides the standard for judicial review of agency decisions under the NHPA and NEPA. *Id.* A reviewing court "shall…hold unlawful and set aside agency action,

findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law; [or] without observance of procedure required

by law." 5 U.S.C. §§ 706(2)(A), (2)(D). This inquiry, while narrow, must be

"searching and careful." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378, 109

S. Ct. 1851, 1861, 104 L. Ed. 2d 377 (1989). In this Circuit, a court

> will strike down agency action as "arbitrary and capricious if the agency
> has relied on factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem, offered
> an explanation for its decision that runs counter to the evidence before
> the agency," or if the agency's decision "is so implausible that it could
> not be ascribed to a different view or the product of agency expertise."

*Turtle Island Restoration Network v. U.S. Dep't. of Commerce*, 878 F.3d 725, 732-

33 (9th Cir. 2017) (*citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.

Co.*, 463 U.S. 29, 43 (1983)). The deference a court owes an administrative agency

under the arbitrary and capricious standard of review of the APA is not unlimited;

the court may not automatically defer to an agency's conclusions, even when those

conclusions are scientific. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776

F.3d 971, 994 (9th Cir. 2014). Because this is a record review case, this Court may

direct that summary judgment be granted to either party based upon de novo review

of the administrative record. *Pit River Tribe*, 469 F.3d at 778 (*citing Ecology Ctr.,

Inc. v. Austin*, 430 F.3d 1057, 1062 (9th Cir.2005)).

# ARGUMENT

## I. THE BLM FAILED TO CONSULT WITH THE BURNS PAIUTE TRIBE PRIOR TO THE ISSUANCE OF THE ROD AND EIS.

### A. The NHPA obligates the BLM to consult with Tribes that attach religious and cultural significance to a property.

The NHPA requires federal agencies to "take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108; *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 581 (9th Cir.1998). Like NEPA, the NHPA "is a stop, look, and listen provision that requires each federal agency to consider the effects of its programs." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999); *United States v. 0.95 Acres of Land*, 994 F.2d 696, 698 (9th Cir. 1993) (Section 106 is "similar to NEPA except that it requires consideration of historic sites, rather than the environment."). Section 106 of the NHPA and its implementing regulations require federal agencies to make extensive, reasonable, and good faith efforts in government-to-government consultation with any Indian Tribe "that attaches religious and cultural significance" to a property whose characteristics may be adversely impacted by a federal undertaking. 54 U.S.C. § 302706(b)(1); *see also* 36 C.F.R. § 800.2(ii)(A). NHPA regulations recognize that the "Federal Government has a unique legal relationship with Indian tribes" and requires consultation with Indian tribes to be "conducted in a sensitive manner respectful of tribal sovereignty" and that consultation "must recognize the

government-to-government relationship between the Federal Government and Indian tribes."  36 C.F.R. § 800.2(c)(2)(ii)(B), (C).

An agency must "consult with any Indian tribe . . . that attaches religious and cultural significance to historic properties that may be affected by an undertaking." 36 C.F.R. § 800.2(c)(2)(ii). Consultation with Tribes "should commence early in the planning process, in order to identify and discuss relevant preservation issues and resolve concerns about the confidentiality of information on historic properties." *Id*. Moreover, 36 C.F.R. § 800.16(f) provides that, "Consultation means the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process."

NHPA regulations specifically require that "the agency official make a reasonable and good faith effort to identify Indian tribes ... that shall be consulted in the section 106 process." 36 C.F.R. § 800.2(c)(2)(ii)(A). In enacting the regulations, the Advisory Council on Historic Preservation ("ACHP")[1] recognized that determining the proper Tribes to consult may be difficult, but that the NHPA requires

---

[1] The NHPA established the ACHP with authority to promulgate regulations necessary to implement the section 106 process. 54 U.S.C. § 304108(a); *Nat'l Ctr. for Preservation Law v. Landrieu*, 496 F.Supp. 716, 742 (D.S.C.) *aff'd. per curiam*, 635 F.2d 324 (4th Cir.1980) (holding that the ACHP has exclusive authority to determine the methods for compliance with NHPA).

it: "While the Council acknowledges certain initial difficulties in identifying tribes to consult outside tribal lands, it believes the statute is clear in mandating such consultation regardless of the location of the historic property." 65 Fed. Reg. 77697, 77702 (December 12, 2000). An agency makes a "reasonable, good faith effort" to consult when it "[s]eek[s] information" from Tribes "likely to have knowledge of, or concerns with, historic properties in the area" and identifies "issues relating to the undertaking's potential effects on historic properties." *Comanche Nation v. United States*, No. CIV-08-849-D, 2008 WL 4426621, at 19 (W.D. Okla. Sept. 23, 2008) (citing 36 C.F.R. § 800.4(a)(3)).

The consultation process is key to protect historic properties. An agency, in consultation with Tribes, "shall apply the criteria of adverse effect to historic properties within the area of potential effects." 36 C.F.R. § 800.5(a). An adverse effect is "when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1).

**B.  BLM's own Agency Tribal Consultation Policies direct consultation with Tribes, such as the Burns Paiute Tribe.**

Consultation between federal agencies and Indian tribes is a cornerstone of modern federal policy. *See, e.g.,* E.O. 13,175, Consultation and Coordination with

Indian Tribal Governments, 65 Fed. Reg. 67,249, 67,250 (2000); Tribal Consultation and Strengthening Nation-to-Nation Relationships (Memorandum for the Heads of Executive Departments and Agencies), 86 Fed. Reg. 7491 (2022) ("It is a priority of my Administration to make … regular, meaningful, and robust consultation with Tribal Nations cornerstones of Federal Indian policy.").

Like other federal agencies, the Department of Interior ("DOI") and BLM have developed policies governing their obligations to consult with Tribes. The Interior Secretarial Order No. 3317 (December 1, 2011)[2] provides guiding principles and a general description of the attributes of meaningful government-to-government consultation between government officials. Consultation is defined as a process that aims to create effective collaboration with Indian tribes and to inform Federal decision-makers. Secretarial Order at 1. Bureaus and offices are required to promote cooperation, participation, and efficiency between agencies with overlapping jurisdictions, special expertise, or related responsibilities when a Departmental action with tribal implications arises. *Id*.

Chapter 5 of the Interior Departmental Manual provides the procedures and process for DOI government-to-government consultation between tribal officials

---

[2] Available at https://www.doi.gov/sites/doi.gov/files/migrated/tribes/upload/SO-3317-Tribal-Consultation-Policy.pdf (visited March 22, 2023) ("Secretarial Order").

and DOI officials[3]. The Departmental Manual provides that "[b]ureaus and offices must consult tribes and … whenever a DOI plan or action with tribal implications arises." Departmental Manual §5.4(A).

BLM Manual 1780 (Tribal Relations) provides comprehensive requirements concerning government-to-government consultation for the BLM. Among other requirements, "The BLM recognizes Indian religious and cultural values as an important, living part of our Nation's heritage. The BLM commits to addressing and, where practicable, minimizing potential disruption of the traditional expression or maintenance of these values that might result from BLM land use decisions." BLM Manual 1780 § 1.6(A)(11)[4].

BLM Handbook 1780-1 (Improving and Sustaining BLM-Tribal Relations) provides guidance concerning tribal relations[5]. The BLM Handbook states, "Consultation is designed to ensure meaningful and timely meetings or discussions with elected or duly appointed tribal leaders (or their authorized representatives) and BLM decision makers as they pertain to proposed BLM actions. Consultation is an

---

[3] Available at https://www.doi.gov/sites/doi.gov/files/uploads/dm_chapter_5_procedures_for_consultation_with_indian_tribes.pdf (visited March 22, 2023) ("Department Manual").

[4] Available at https://www.blm.gov/sites/blm.gov/files/uploads/MS%201780.pdf (visited March 22, 2023) ("BLM Manual").

[5] Available at https://www.blm.gov/sites/blm.gov/files/uploads/H-1780-1__0.pdf (visited March 22, 2023).

opportunity for tribes to discuss the potential effects of planned agency actions on tribal interests and to make recommendations to the agency." BLM Handbook 1780-1 § III(A)(3). The requirements for consultation are more specific when involving mining projects: "Consultation must seek to ascertain tribal concerns about areas proposed for mineral leasing or development. These include areas of traditional use, access to sacred sites, and other locations of cultural sensitivity." BLM Handbook 1780-1 § XIII(C).

The Handbook, like NHPA, recognizes that consultation is the key to determining the cultural significance of a historic property: "The BLM cannot know if a tribe ascribes traditional or cultural importance to a place unless it asks the tribe." BLM Handbook 1780-1 § IX(B)(1)(a).

The Handbook recognizes that Tribes may not want to consult at the broader land management planning stage but may defer once a specific project is proposed: "Tribes are often reluctant to reveal information about places of religious and cultural importance until they perceive a definite threat to those places. For that reason, tribes may not want to tell the BLM about specific sacred sites and other traditional places at the land use planning level when the agency does not yet know about specific impacts to particular geographical locations." BLM Handbook 1780-1 § IV(A)(1).

16

Courts have long held that an agency must comply with its own internal policies, including consultation requirements, even if those are more rigorous than procedures required other laws. *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 713 (8th Cir.1979) (*citing Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974)); *see also United States v. Caceres*, 440 U.S. 741, 760 (1979) ("[W]here internal regulations do not merely facilitate internal agency housekeeping, but rather afford significant procedural protections, we have insisted on compliance[.]"); *Massachusetts Fair Share v. Law Enf't Assistance Admin.*, 758 F.2d 708, 711 (D.C. Cir. 1985) (noting that "[i]t has long been settled that a federal agency must adhere firmly to self-adopted rules by which the interests of others are to be regulated," and that "[t]his precept ... is not limited to rules attaining the status of formal regulations"); *Nat'l Small Shipments Traffic Conference, Inc. v. ICC*, 725 F.2d 1442, 1449 (D.C. Cir. 1984) (an "agency must follow its own procedures whether they are mandated by law or not").

Where an agency has established a policy requiring prior consultation with a Tribe, and therefore created a justified expectation that the Tribe will receive a meaningful opportunity to express its views before policy is made, that opportunity must be given. *Lower Brule Sioux Tribe v. Deer*, 911 F.Supp. 395, 399 (D.S.D.1995) (*citing Oglala Sioux Tribe*, 603 F.2d at 721); *see also Winnebago Tribe of Nebraska*

*v. Babbitt*, 915 F.Supp. 157, 163 (D.S.D.1996) (holding that the BIA has the discretion to terminate employees but must consult with tribe first).

**C.  NEPA creates an independent obligation, separate from the NHPA, for the BLM to consult with Tribes.**

NEPA's implementing regulations require agencies to "consult[ ] early with appropriate State, Tribal, and local governments." 40 C.F.R. § 1501.2(b)(4)(ii).  The regulations further emphasize that during the scoping process, the lead agency must "invite the participation of likely affected Federal, State, Tribal, and local agencies and governments...." 40 C.F.R. § 1501.9(b). Once the draft environmental impact statement is prepared, but before a final statement is issued, the agency shall request the comments of State, Tribal, or local governments that may be affected by the proposed action." 40 C.F.R. § 1503.1(a)(2)(iii); 42 U.S.C. § 4332(c). Thus, for Tribes, NEPA provides an enhanced opportunity through the consultation process to actively help the lead agency shape and mold the underlying Federal action.

**D.  BLM had a duty to consult with the Tribe and failed to do so.**

Appellees do not dispute that BLM failed to engage in consultation with the Tribe. 2-ER-137.  The sole dispute is whether it was reasonable for BLM to not consult with Burns Paiute Tribe.

Evidence in the record supports that the Tribe has a strong interest in the Project area and believes that the area is of religious and cultural significance.  As

depicted below, BLM recognized that the Project area is within the "aboriginal territory" of the Northern Paiute, which includes the Burns Paiute Tribe.



3-ER-442; 3-ER-443 ("Currently, Northern Paiute people live scattered about on reservations and other communities throughout California, Oregon, and Nevada."); 3-ER-447 (list of Northern Paiute Reservations and Colonies that includes the Burns Paiute Tribe).

BLM's past ethnographic assessment supports the importance of the area to the Tribe: "Ethnohistoric habitation sites are generally considered to be culturally significant to Northern Paiute and Western Shoshone consultants." 3-ER-472. That

assessment also indicated Tribal concerns about development: "Both Northern Paiutes and Western Shoshones have expressed strong concerns about potential impacts to and the protection and preservation of culturally significant areas in general, including burial sites, sacred sites (i.e., mountains and all springs, particularly hot springs), ethnohistoric habitation sites, and traditional resource collection areas (particularly pine nut gathering areas)." 4-ER-504. This supports a conclusion that the Tribe has strong ties to the area, that it is within its traditional territory, and it has concerns about its protection.

Considering this, the administrative record lacks reasoning on why a decision was made not to consult with the Burns Paiute Tribe. It contains no documents indicating that the Burns Paiute Tribe did not want to consult on the Thacker Pass Project. Instead, the District Court relied on two documents to support the Court's conclusion that failing to consult with the Tribe was reasonable.

### 1. BLM's after-the-fact email does not demonstrate that the agency made a reasonable and good faith effort to identify Tribes for consultation.

The District Court's decision erroneously relied on an email created after the completion of consultation that provided an after-the-fact justification of BLM's consultation decision. 1-ER-41-42. That email failed to even mention the Burns Paiute Tribe focusing solely on whether BLM should have consulted with the Pyramid Lake Paiute Tribe. *Id.* The court suggested that this email provided factors

that were relevant in supporting the BLM's determination, including geographic proximity, historical ties, and previous interest. *Id.* However, these factors are either invalid considerations or not supported by the record.

NHPA regulations make it clear that geographic proximity is not a valid consideration, instead requiring consultation with Tribes that attach religious and cultural significance to a property "regardless of the location." 36 C.F.R. § 800.2(c)(2)(ii); 36 C.F.R. § 800.2(c)(2)(ii)(D) ("Federal agencies should be aware that frequently historic properties of religious and cultural significance are located on ancestral, aboriginal, or ceded lands of Indian tribes … and should consider that when complying with the procedures in this part.").

ACHP section 106 guidance on Tribal Consultation recognizes that "[i]n many cases, because of migration or forced removal, Indian tribes may now be located far away from historic properties that still hold significance for them."[6] This was certainly the case for the Burns Paiute Tribe, which includes Thacker Pass in its traditional territory. 2-ER-54, 70, 3-ER-442. Recognizing this, the ACHP Guidance states that "the regulations require that federal agencies make a reasonable and good-

---

[6] ACHP, Consultation with Indian Tribes in the Section 106 Review Process: A Handbook at 17-18 (June 2021), https://www.achp.gov/sites/default/files/2021-06/ConsultationwithIndianTribesHandbook6-11-21Final.pdf (visited March 22, 2023) at 18 ("ACHP Guidance").

faith effort to identify Indian tribes that may attach religious and cultural significance to historic properties that may be affected by the undertaking, even if Indian tribes are now located a great distance away from such properties and undertakings." *Id.; see also* 65 Fed. Reg. at 77702 ("While the Council acknowledges certain initial difficulties in identifying tribes to consult outside tribal lands, it believes the statute is clear in mandating such consultation regardless of the location of the historic property.").

Moreover, the BLM's own documents refute the lack of any historic ties. As explained above, the BLM's ethnographic assessment supports a conclusion that the Tribe has strong ties to the area, that it is within its traditional territory, and it has concerns about its protection. The ACHP Guidance indicate that ethnographies can provide information to support Tribes that must be invited to consult. ACHP Guidance at 18.

Lastly, past interest in not a valid factor here. BLM, historically, invited consultation with the Tribe on projects, including those involving repatriation of human remains, in BLM's Winnemucca District (the district at issue here). For example, the record indicates that BLM invited the Tribe to consult in 2002 on a proposed environmental assessment for geothermal leasing. 3-ER-468. In 2006, 21 Tribes and one tribal organization, including the RSIC and Burns Paiute Tribe, were contacted by the BLM as part of the Winnemucca Field Office Resource

22

Management Plan ("RMP") and related EIS, which covers the Project area. 4-ER-511-21.

In 2013, BLM sought to consult with 18 Tribes, again including the RSIC and the Burns Paiute Tribes, about "human remains and associated funerary objects" that were removed from Elephant Mountain Cave in Humboldt County (the same county where the Thacker Pass Project is located). Notice of Inventory Completion, 78 Fed. Reg. 59958, 59959 (Sept. 30. 2013). According to the notice, the BLM Nevada State Office invited the Tribes to consult in the development of a "detailed assessment of the human remains and associated funerary objects." 78 Fed. Reg. at 59959. The BLM concluded that the Burns Paiute were connected to human remains found in the area:

> Multiple lines of evidence—guided by tribal consultations—including **geographic, oral tradition, archeological, genetic, and aboriginal land claims, demonstrate a shared group identity between these human remains and some of the modern-day tribes of the Northern Paiutes**. … Today, the culturally affiliated tribes of the Northern Paiutes are: … **Burns Paiute Tribe** (previously listed as the Burns Paiute Tribe of the Burns Paiute Indian Colony of Oregon); … Reno-Sparks Indian Colony, Nevada; … (hereafter referred to as "The Tribes").

78 Fed. Reg. at 59959-60 (emphasis added). BLM's actions in 2006 and 2013 indicate that it knew of the important connection of these Tribes to the area.

BLM's actions in 2006 and 2013 indicate that it knew of the important interest of the Tribe in the area.

23

**2.    A 17-year-old statement by a Burns Paiute employee on a different project does not excuse BLM's failure to consult with the Burns Paiute Tribe.**

The District Court's decision erroneously relied on a 17-year-old statement from a Tribal staff member (not Tribal Council member) on a different project, the ethnographic assessment for the Winnemucca RMP (not the Thacker Pass EIS or NHPA consultation), stating that the Tribe "would defer consultation to the tribes that had reservations closer to the study area." 4-ER-521.  That request was limited solely to "the mailing list for the RMP/EIS." *Id.*  The Tribal government was not waiving all future consultations by that deference. In fact, as discussed above, the RMP process showed BLM that a much broader range of Tribes might have interests in the area.

For the RMP's ethnographic assessment, BLM reached out to more than twenty Tribes or tribal entities, including the Burns Paiute Tribe. 4-ER-511-21.  The BLM, itself, has acknowledged that Tribes may be reluctant to consult in the RMP process because it does not involve specific projects. BLM Handbook 1780-1 § IV(A)(1) ("[T]ribes may not want to tell the BLM about specific sacred sites and other traditional places at the land use planning level when the agency does not yet know about specific impacts to particular geographical locations."). [7]

---

[7] Failure to consult on the RMP is certain reasonable given to RMPs that do not authorize any specific projects. *Ohio Forestry Association v. Sierra Club*, 523 U.S. 726, 733-34 (1998). The abstract level of analysis provided at the RMP cannot

Whether the Tribe responded or not, is not material nor excuse the BLM's action. *United Keetoowah Band of Cherokee Indians in Oklahoma v. Fed. Commc'ns Comm'n*, 933 F.3d 728, 748 (D.C. Cir. 2019) (Agency "has a non-delegable duty to consult with Tribes about the effect of federal undertakings on property significant to the Tribes, which Tribes can invoke or waive as they choose."). Tribes may not always be able or willing to consult at every opportunity. Tribes are often overwhelmed by the number of consultation requests that they receive from federal agencies and must prioritize the response.[8] BLM policy recognizes this in the BLM Handbook at III-4:

> There may be a variety of reasons why a tribe was unable to respond beyond those described below. The lack of response might be due to—
> - Sensitivity of the issues involved,
> - Reluctance to divulge specific information until later in the process when it might become more certain that areas of concern really will be adversely affected,
> - Mislaying or sidelining of BLM correspondence, or

substitute for the NHPA and NEPA analysis required prior to approving the Project. *See, e.g., Neighbors of Cuddy Mountain v. United States Forest Service*, 137 F.3d 1372, 1376 (9th Cir. 1998).

[8] Colette Routel & Jeffrey Holth, Toward Genuine Tribal Consultation in the 21st Century, 46 U. Mich. J.L. Reform 417, 463 (2013) ("The federal government had a duty to consult with Indian tribes who could be affected, but because of tight deadlines, consultation was occurring simultaneously on these projects… This illustrates how burdensome consultation can be in practice, particularly for small tribes with little to no resources. When a heavy volume of requests is combined with the often dissatisfying nature of the consultation process, many tribes simply opt out of this right."); Aila Hoss, Securing Tribal Consultation to Support Tribal Health Sovereignty, 14 Ne. U.L. Rev. 155, 178 (2022) ("[T]he burden on Tribes to assess and consult on each of these activities is also immeasurable. Substantial time and resources go into assessing the impact of an agency action.").

- Delegating response to a tribal staff member who was out of the office.

Importantly, the BLM Handbook also recognizes that a failure to respond is not an invitation to stop - "As the Secretary's policy on Indian tribal consultation makes clear, even if the BLM has made an attempt to initiate consultation and has not received a response, the BLM must still make additional reasonable efforts periodically throughout the planning process to repeat invitations to consult." *Id.* BLM's failure to consult is not reasonable considering its own guidelines for consultation in the BLM Handbook.

> **3.** **No evidence exists in the record that BLM sought assistance from the Nevada SHPO to determine Tribes with which to consult.**

The District Court erroneously concluded that the failure to consult with the Tribe was reasonable because the Nevada State Historic Preservation Office ("SHPO") did not identify additional Tribes required for consultation relying on the district court's decision in *Ctr. for Biological Diversity v. United States Army Corps of Engineers*, Case No. CV 14-1667 PSG (CWX), 2015 WL 12659937 at *21 (C.D. Cal. June 30, 2015), *aff'd sub nom. Friends of Santa Clara River v. United States Army Corps of Engineers*, 887 F.3d 906 (9th Cir. 2018). 1-ER-42. This conclusion is without merit.

The facts in *Ctr. for Biological Diversity* are distinguishable from those here. First, the Army Corps in that case actively sought the assistance of the California

SHPO to identify Tribes with which to consult. 2015 WL 12659937 at *21. BLM did not seek assistance from the SHPO with identification of additional Tribes with which to consult. *See* 3-ER-215-17 (Letter to SHPO does not request any assistance identifying Tribes). Moreover, the SHPO has no duty to proactively identify Tribes, that duty is the BLM's. 36 C.F.R. § 800.2(c)(2)(ii).

Second and unlike this case, the Corps in *Ctr. for Biological Diversity* also reached out to an inter-tribal organization, "the Native American Heritage Commission ('NAHC'), the official 'trustee' agency for Native American affairs in California" for additional assistance identify Tribes. 2015 WL 12659937 at *20. No similar effort occurred in this case by the BLM. In fact, there is nothing in the record to indicate that the BLM sought any assistance in identifying Tribe with which it should consult. While BLM previously has reached out to the Inter-Tribal Council of Nevada on other projects, 4-ER-517, it did not for this Project.

Lastly, the court's decision in *Ctr. for Biological Diversity* also rested, in part, on the fact that the plaintiffs had failed "to exhaust their administrative remedies necessary to bring the Santa Ynez Band consultation issue before the Court." *Id.* at *21. Again, this is nothing like the facts of this case and *Ctr. for Biological Diversity* simply does not support the BLM's argument.

**4.      Publication in the Federal Register does not satisfy BLM's consultation obligations.**

The District Court misconstrued the requirements of the NHPA and found that a notice in the Federal Register of its intent to prepare a DEIS met the BLM's NHPA obligations relying on this Court's decision in *Shiny Rock Min. Corp. v. United States*, 906 F.2d 1362, 1364 (9th Cir. 1990).  1-ER-41.  Again, this conclusion is without merit.

First, this Court's decision in *Shiny Rock Min. Corp.* addresses the commencement of a statute of limitation and does not address tribal consultation obligation of a federal agency in any way.  906 F.2d at 1364.

Second, the Court misread the intent of the public notice, which is intended to "initiate public consultation" and not tribal consultation.  1-ER-ER.  The NHPA has provisions separate from the tribal consultation requirements that requires an agency to provide public notice and to seek public comment.  36 C.F.R. § 800.2(d)(2).  This is separate and apart from the obligation to consult with Tribes and what the Federal Register notice was accomplishing.

Third, public notice simply does not equate to consultation. The NHPA creates an affirmative duty to consult.  The regulations make clear that "it is the statutory obligation of the federal agency to fulfill the requirements of Section 106 and to ensure that an agency official with jurisdiction over an undertaking takes legal

28

and financial responsibility for Section 106 compliance." 36 C.F.R. § 800.2(a). BLM bears the responsibility to ensure that full consultation occurred.

Accordingly, tribal consultation cannot be treated as a pro forma requirement, but must be meaningful. *Quechan Tribe v. U.S.*, 755 F. Supp. 2d 1104, 1118-19 (S.D. Cal. 2010) ("pro-forma" recitals are not "meaningful consultation" as required by Section 106). Courts have been clear that merely sending a letter or providing public notice is not sufficient. *Pueblo of Sandia v. U.S.*, 50 F.3d 856, 860 (10th Cir. 1995) (mailing letters requesting information and addressing meetings was not sufficient to meet the reasonable efforts requirements); *Confederated Tribes & Bands of Yakima Indian Nation v. FERC*, 746 F.2d 466, 475 (9th Cir. 1984) (Notice alone is not sufficient, the "consultation obligation is an affirmative duty").

Fourth, there is no evidence in the record to suggest that the Tribe knew about or had reason to know about the project. There were no efforts to consult, and a letter was never sent to the Tribe. In fact, the Tribe indicated that it did not know about the project until May 2021 and then sent a letter expressing concern. 2-ER-73.

Lastly, BLM's own policy that requires that consultation involve direct communication and not merely providing notice: "The Department Tribal Consultation Policy notes that sending a letter to a Tribe and receiving no response does not constitute a sufficient effort to initiate tribal consultation." BLM Manual 1780 at III-2.

29

**5.    BLM has an obligation to consult with every Tribe with an interest in the area on every project.**

The District Court found it unreasonable that "BLM must consult every tribe on every project" and that the Tribe's argument has no limiting principle. 1-ER-44. However, NHPA, NEPA, and BLM's own policies provide a limit requiring BLM to consult with every Tribe that attaches religious or cultural significance to a project area regardless of where the Tribe is located. This is an ongoing obligation for every project impacting an area where a Tribe has an interest.

Courts have found compliance with an agency's obligation to make a "reasonable and good faith effort to identify Indian tribes" under 36 C.F.R. § 800.2(c)(2)(ii)(A), which mean it must make an extensive effort to consult with Tribe and not the narrow and select list of Tribes that were consulted here. *San Juan Citizens All. v. Norton*, 586 F. Supp. 2d 1270, 1292 (D.N.M. 2008) (BLM "sent letters to 51 different tribal governments and 29 other tribal officials). Inviting the 21 Tribes and one tribal organization, which had been contacted by the BLM as part of the Winnemucca RMP, rather than a list of three Tribes, would certainly have satisfied BLM's NHPA obligations. BLM's earlier reliance on archeological, ethnographic information, and land claims to determine with whom to consult is consistent with the ACHP Guidance, which states that agencies should rely on lists of Tribes with whom they have consulted in past Section 106 reviews and ethnographic studies. ACHP Guidance at 18.

30

Consultation may be difficult for agencies, but an agency must still make a reasonable and good faith effort to identify all Tribes that may have an interest in a historic property, and that the agency is obligated to consult with all of them. While this may present challenges in carrying out consultation, it does not absolve the agency from its obligations to consult.

The Tribe urges this Court to look to the BLM's own measure of whether it met its consultation obligation – "[A] good way to gauge whether the BLM's consultation efforts have been defensible is to consider the degree to which an objective review of the decision record would find a good faith effort to identify, notify, respond, and meaningfully involve and include comments received from Indian tribes potentially affected by a proposed decision and by avoiding preventable interference with traditional religious and cultural practices."  BLM Manual at A2-3.  A review of this record does not meet that measure.

## II.    THE BLM FAILED TO DISCLOSE AND ANALYZE CURRENT CULTURAL USES AND THE SIGNIFICANCE OF THE AREA TO THE TRIBE IN THE ROD AND EIS.

### A.    NEPA obligates the BLM to take a "hard look" at the impacts of a project, including impacts to cultural resources.

NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its aims are to ensure that federal agencies: (1) consider the environmental impacts of their proposed actions; (2) inform the public about environmental concerns; and (3) take actions that protect, restore, and enhance the

environment. *Id.* To accomplish these objectives, NEPA requires federal officials to prepare an environmental impact statement ("EIS") to consider the effects of each "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

An EIS must identify and provide a full and fair discussion of all significant environmental impacts caused by the proposed action/project. 42 U.S.C. § 4332; 40 C.F.R. § 1502.1. The EIS shall describe the environment of the area. 40 CFR § 1502.15.

NEPA and its implementing regulations require federal agencies to take a "hard look" at the direct, indirect, and cumulative environmental impacts of proposed actions using the best available scientific information. 42 U.S.C. § 4332*; see also* 40 C.F.R. § 1502.16(a)(8) (effects include historic and cultural resources). An action will be set aside as arbitrary or capricious if the agency can identify no "rational connection between the facts found and the choice made;" that is, if the "explanation for its decision [ran] counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43.

Among the purposes expressly set out in NEPA is the preservation of "important historic, cultural, and natural aspects of our national heritage ..." 42 U.S.C. § 4331(b)(4). Pursuant to 40 C.F.R. § 1502.16(a)(8), an EIS must include

32

discussion of "historic and cultural resources ..."  "When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment." 40 CFR § 1508.14.

**B.    The EIS and ROD failed to disclose and analyze current cultural uses and the significance of the Project area to Tribes.**

It is undisputed that the Project area is sacred to the Tribe – both the District Court and Appellees have acknowledged this – "Defendants do not dispute that the Tribes consider the entire Thacker Pass area sacred." *Bartell Ranch LLC v. McCullough*, 558 F. Supp. 3d 974, 990 (D. Nev. 2021).  Unfortunately, the EIS failed to take the required "hard look" at the area's the significance of the landscape to the Tribes and current uses by tribal members.  This Court must "ensure that [the] agency has taken the requisite 'hard look' at the environmental consequences of its proposed action, carefully reviewing the record to ascertain whether the agency decision is 'founded on a reasoned evaluation of the relevant factors.'" *Wetlands Action Network v. U.S. Army Corps of Eng'rs.*, 222 F.3d 1105, 1114 (9th Cir. 2000).

The District Court misconstrued the fact finding that the EIS did take a hard look at current uses and significance pointing to archaeological inventories in the record, including a Class III inventory referred to in the District Court's order which includes a two-page historic description of Tribal use in the area ending in 1936 when "most Native Americans in Nevada were living on reservation land."  1-ER-

45-45, *citing* 3-ER-274-75.   However, these inventories and the two-page narrative examine Tribes as a historic artifact and not as a living people who continue to use the land and attribute cultural, religious, and historic significance to it.  3-ER-274-75. Moreover, a review of the record indicates that the BLM's analysis focused solely on archaeological sites, as opposed to assessing areas of cultural or religious significance.   3-ER-218-419 (inventory relied upon contains no ethnographic analysis of current use/significance); 2-ER-125 (EIS indicates reliance on inventory with no current cultural assessment).

The significance of this area to Tribes extends much farther than prehistoric archaeological resources. *See* 2-ER-72 ("It is an area that contains plants and wildlife that the Tribe hunted and gathered and continue to hunt and gather.") Cultural resources often reflect resources and areas (traditional cultural properties[9]) that are currently used and held sacred by a Tribe.

BLM was aware of this. Despite this, the EIS concluded that there is no identified disturbance to traditional cultural properties, properties of religious and cultural importance, and sacred sites.  2-ER-123.  These conclusions are contradicted by the record.

---

[9] A "traditional cultural property" is a historic site "'associate[ed] with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community.'" *Navajo Nation v. U.S. Forest Serv*., 479 F.3d 1024, 1029 (9th Cir. 2007).

The BLM's own document, the 2007 ethnographic assessment, recognizes the significance of the area to Tribes and concern with mining and its impacts:

> Both Northern Paiutes and Western Shoshones have expressed strong concerns about potential impacts to and the protection and preservation of culturally significant areas in general, including burial sites, sacred sites (i.e., mountains and all springs, particularly hot springs), ethnohistoric habitation sites, and traditional resource collection areas (particularly pine nut gathering areas). These concerns include:
> - Disturbance of burials through mining development …
> - Disturbance of archaeological sites, regardless of National Register eligibility …
> - Disturbance of culturally sensitive places, in general, by mining …

4-ER-503-04.

The Assessment specifically identifies the current significance of the area to Tribes, not simply concerns with prehistoric archaeological resources, including "resource collection areas (particularly pine nut gathering areas)," "culturally important plant species," and "access to lands traditionally used for plant gathering and hunting." 4-ER-503. Remarkably, the EIS failed to even cite the BLM's own assessment and failed to take a hard look at these concerns.

BLM's archaeologist called for such an analysis, but it was not included. 2-ER-161 ("It'd be interesting to add a tribal produced ethnographic background, or even a second synthesis/conclusion section from an indigenous perspective."). This was not disclosed in the EIS.

35

As pointed out in its own guidance, "Traditional Cultural Places & Indian Sacred Sites," BLM has an obligation under NEPA to consider the traditional culture properties and sacred sites. 2-ER-165 ("If a place matters to a tribe, we need to factor that information into our analysis and decisions on proposed actions."); 2-ER-167 ("If the site does not meet the NRHP eligibility criteria, it would still need to be considered under EO 13007 and AIRFA through the NEPA analysis, but not under the NHPA."). In taking a "hard look," BLM must specifically consider impacts to "historic and cultural resources ..." 40 C.F.R. § 1502.16(a)(8).

This case is in sharp contrast from another District of Nevada case involving BLM, *Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*, No. 214CV00226APGVCF, 2017 WL 3667700, at *9 (D. Nev. Aug. 23, 2017), where the court found that the BLM adequately considered tribal uses:

> [T]he record reveals that the agency thoroughly considered the pipeline's potential impacts on these sites, which is what NEPA requires. BLM analyzed impacts on culturally significant plants and animals, including plant species identified by the tribes through consultation. These impacts are described in the vegetation section of the EIS, which identifies impacts to culturally sensitive plants, their habitat, and wildlife that consume them. The EIS discusses the cultural and spiritual significance of water to the Goshute Tribe and the tribe's objections to the groundwater pumping. The EIS explains how the 76 possible sites with religious and cultural significance might be affected. Indeed. BLM identified several important cultural sites while consulting with the tribes, and recommended those for designation on the National Register as Traditional Cultural Property.

36

That is the type of analysis that should have occurred here. Cultural resources are not simply prehistoric materials, as were assessed by BLM as part of this project. Tribes are a living element that continue to use and value the landscape.

Despite the agency's own assessment (and admissions), the BLM failed to take a "hard look" at the significance of the landscape to the Tribes as a sacred site or as a traditional cultural property and impacts that the Project would have, including upon use of traditional foods, gathering of resources, and other traditional uses. There is no discussion of current uses of the area by Tribes or of its significance. A hard look at environmental impacts required BLM to examine the living use of this area by Tribes and it simply was not.

### C.  BLM's failure to consult with the Tribe deprived it of necessary information to take a "hard look" at impacts of the Project.

By not consulting with all the Tribes whose cultural and historic resources are most affected by this Project, BLM failed to uphold its obligation under NEPA. "Pursuant to NEPA's 'hard look' requirement, the agency must ensure that 'the adverse environmental effects of the proposed action are adequately identified and evaluated.'" *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 123 (D.C. Cir. 2017) (internal citations omitted).

In taking a "hard look" BLM must specifically consider the '[u]nique characteristics of the geographic area such as proximity to historic or cultural resources'; . . . and the degree to which the action 'may cause loss or destruction of

significant . . . cultural[] or historical resources.'" 40 C.F.R. § 1508.27; *see also*

*Standing Rock*, 255 F. Supp. 3d at 123. By failing to consult with the Tribe, BLM

could not have properly identified or evaluated significant cultural resources.

Had BLM properly consulted with the Tribe (and others) before finalizing the

EIS, it would have learned that local tribal members consider Thacker Pass to be

historically significant for many reasons. BLM would have learned that Thacker

Pass is considered a singularly powerful spiritual place blessed by Tribal ancestors,

other spirits, and golden eagles – which Paiute people believe are directly connected

to the Creator. BLM would also have learned that local Tribal members hunt and

gather traditional foods and medicines in Thacker Pass and routinely visit Thacker

Pass to practice their traditions. 2-ER-72-73. In other words, if BLM would have

consulted with Tribes, it would have learned that, for many Americans – especially

many Native Americans –the prevalent cultural resources element of the Project is

much more than archaeological resources.

### D. The District Court erroneously found that the Tribe lacked prudential standing to raise NEPA arguments.

In a footnote, the District Court concluded that the Burns Paiute lacked

prudential standing to raise concerns about the failure of the EIS to address impacts

to Tribe. 1-ER-44. This conclusion is inconsistent with well-established NEPA

law.

Under the APA, "a person ... adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The Supreme Court has interpreted this section of the APA as imposing a prudential standing requirement that "the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute ... in question." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The zone of interests test is not intended to impose an onerous burden on the plaintiff and "is not meant to be especially demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987).

The Tribe's interest in preserving its cultural integrity of the landscape and preventing adverse effects from the Project falls squarely within the zone of interests protected by NEPA. *See, e.g.,* 42 U.S.C. § 4331(b)(4) (noting congressional purpose to "preserve important historic, cultural, and natural aspects of our national heritage"); *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 486 (9th Cir.2011); *Presidio Golf Club v. National Park Service*, 155 F.3d 1153, 1158–59 (9th Cir.1998). Accordingly, the Tribe has standing to assert claims regarding the BLM's deficient NEPA analysis.

**CONCLUSION**

BLM had an obligation under the NHPA, NEPA, and its own policies to consult with the Tribe prior to finalizing the ROD and EIS. It failed to meet that obligation. BLM also failed to meet its obligation to take a "hard look" at the Project and its impacts because it treated Tribes as a historic artifact and did not look at current uses and significance of the area to Tribes. This was impaired, in a large part, by its decision to consult with a list of three Tribes, instead of the over twenty Tribes in which it consulted with in the past.

For the foregoing reasons, the Burns Paiute Tribe requests that this Court reverse the judgment of the District Court and vacate the EIS and ROD for the Thacker Pass Lithium Mining Project.

Respectfully submitted this 22nd day of March 2023.

> *s/ Rick Eichstaedt*
> Rick Eichstaedt (WSBA# 36487)
> Rey-Bear McLaughlin, LLP
> 421 W Riverside Ave., Suite 1004
> Spokane, WA 99201-0410
> 509.251.1424
> rick@rbmindianlaw.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief complies with the type-volume limitation of Rule 32(a)(7)(B)(i) in that, according to the word-count feature of the word processing system in which the brief was prepared, the brief contains 8,919 words, excluding the portions exempted by Rule 32(f). The brief has been prepared in a proportionally spaced typeface, 14-point Times New Roman font.

Dated: March 22, 2023

*/s/ Rick Eichstaedt*
Rick Eichstaedt

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Appellants state that they are not aware of any related cases pending in this Court.

Dated: March 22, 2023

*/s/ Rick Eichstaedt*
Rick Eichstaedt

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of March 2023, a copy of the foregoing APPELLANT'S OPENING BRIEF was served via the ECF filing system which will send notification of such filing to all parties of record.

*/s/ Rick Eichstaedt*
Rick Eichstaedt